UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

FRANCES E. BRANHAM,

              Plaintiff,                                Civil Action No. 14-CV-12454

vs.                                             HON. MARK A. GOLDSMITH

CAROLYN COLVIN,
ACTING COMMISSIONER OF
SOCIAL SECURITY,

              Defendant.
_____/

**OPINION AND ORDER (1) OVERRULING PLAINTIFF'S OBJECTIONS
(Dkt. 28), (2) ACCEPTING THE RECOMMENDATION CONTAINED IN THE
MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION (Dkt. 27),
(3) DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT (Dkt. 23), AND
(4) GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (Dkt. 25)**

## I.  INTRODUCTION

In this social security case, Plaintiff Frances E. Branham appeals from the final

determination of the Commissioner of Social Security that she is not disabled and, therefore, not

entitled to disability benefits.  The matter was referred to Magistrate Judge Elizabeth A. Stafford

for a Report and Recommendation ("R&R").  The parties filed cross-motions for summary

judgment (Dkts. 23, 25), and Magistrate Judge Stafford issued an R&R recommending that the

Court deny Plaintiff's motion and grant Defendant's motion (Dkt. 27).  Plaintiff filed objections

to the R&R (Dkt. 28), and Defendant filed a response (Dkt. 29).  For the reasons that follow, the

Court overrules Plaintiff's objections, accepts the recommendation contained in the Magistrate

Judge's R&R, denies Plaintiff's motion, and grants Defendant's motion.

## II.  BACKGROUND

Plaintiff applied for social security benefits on July 12, 2011, on the basis of severe arthritis, diabetes, high blood pressure, allergies, and depression.  Administrative Record ("A.R.") at 113 (Dkt. 14).  She was denied disability benefits at the initial level, id. at 124, and requested a hearing before an Administrative Law Judge ("ALJ"), id. at 130.  A hearing was held, and the ALJ concluded that Plaintiff was not disabled under the Social Security Act from the alleged date of onset, June 15, 2009, through the date of the ALJ's decision, December 20, 2012.  Id. at 74-75.  Specifically, the ALJ determined that Plaintiff had the residual functional capacity ("RFC") to perform her past work as a bill collector, dining room manager, and restaurant manager.  Id. at 74.  This appeal followed.

### A.  Relevant Medical History

On August 14, 2010, Plaintiff fell while intoxicated, injuring her left arm.  A.R. at 356.  She went to the emergency room the following day, reporting significant left arm pain.  Id. at 354.  Plaintiff stated that she did not have numbness or tingling in her left arm and was not experiencing pain anywhere else.  Id.  Aside from pain and tenderness in her left shoulder, a physical examination of Plaintiff's extremities revealed no tenderness or abnormalities.  Id.  An x-ray of her left shoulder revealed a left humerus fracture.  Id. at 356-357, 368, 369.  In addition to the fracture, the x-ray also showed a "tiny 2 mm osseous fragment," and "mild acromioclavicular joint degenerative changes."  Id. at 368.  Plaintiff returned for a follow-up on August 25, 2010, and again denied numbness or tingling in her left arm, or pain anywhere else; she was referred to physical therapy.  Id. at 350.  Follow-up examinations indicate that Plaintiff's pain and range of motion were improving, albeit slowly; there was some concern that Plaintiff also had a rotator-cuff tear.  Id. at 340, 346.  Plaintiff frequently called to request refills of her

2

pain medication, occasionally reporting pain levels at a "5" or "6" even with the medication, and she expressed resistance to attempts to reduce the strength or dosage.  Id. at 344-345, 342-343, 338-339, 336, 334 (expressing resistance to a lower dosage), 332, 331 (reducing dosage and refusing refills until Plaintiff could be seen in clinic), 329-330 (rescheduling follow-up and requesting refill; reporting pain at "6" or "7"), 327 (reducing dosage from 6 to 4 pills a day), 325-326 ("She has been warned twice that she needs to be seen prior to med refills . . . .  No refill, have her call her [primary care physician] or use [over-the-counters].").[1]

Plaintiff returned for a follow-up visit on April 6, 2011, reporting continued "achiness" and decreased range of motion in her left shoulder.  Id. at 324.  On examination, Plaintiff showed positive impingement signs and a limited range of motion, but had full strength in her upper extremity.  Id.  Radiographs showed a healed fracture, and the clinic had no restrictions for her, but referred her for an ultrasound.  Id.; but see id. at 364 (x-ray showed an "incomplete healing" of the fracture).  The ultrasound, dated April 13, 2011, demonstrated "supraspinatus tendinosis," two partial-thickness tears, in addition to subscapularis tendinosis.  Id. at 363.  Plaintiff was diagnosed with left shoulder rotator cuff tendinopathy and adhesive capsulitis, and she was referred to physical therapy to treat her left shoulder pain, and to increase her range of motion and strength.  Id. at 378.

In April 2011, Plaintiff began seeing Dr. Eleni Dimaraki, M.D., at the Endocrinology and Metabolism Clinic for uncontrolled type 2 diabetes mellitus.  Plaintiff explained that she had previously responded well to oral medications, but had been off medications for about a month and a half.  Id. at 321, 322.  On her first visit, Plaintiff complained of, among other symptoms, restless legs and feet, burning in her feet, back and joint pain and stiffness, depressed mood, and anxiety.  Id.  She reported spending time with her grandchildren and dogs, as well as refurbishing

---

[1] All references to pain levels are premised on a "1" to "10" scale.

old furniture.  Id.  Upon examination, Plaintiff did not appear to be in distress, and her feet were in good condition, with no signs of infection.  Id. at 322.  Dr. Dimaraki restarted Plaintiff on her prior medications and, as requested, also refilled her prescription for Norco, while advising Plaintiff that it would be more appropriate to contact her primary care physician or orthopedic surgeon for future pain management.  Id.  Plaintiff requested an additional refill in May, because she had been unable to see her primary care physician or her orthopedic surgeon, and Dr. Dimaraki denied the request.  Id. at 317.  Plaintiff asked Dr. Dimaraki to reconsider, stating that her entire body was in pain, especially the tops of her feet, and that she felt the pain was related to her diabetes.  Id. (indicating that she could not "get up and move around without [the pain medication].").  Dr. Dimaraki forwarded the request to Plaintiff's primary care physician, Dr. Annissa Hammoud, M.D.; however, Dr. Hammoud also declined to write a prescription because Plaintiff was a new patient who had not yet been seen.  Id. at 317-318.  Plaintiff continued to request pain medication from Dr. Dimaraki, stating that her entire body ached, particularly her hips, and rating her pain at an "8"; Dr. Dimaraki, again, declined.  Id. at 310-311.

A May 2011 physical examination showed pain and markedly decreased range of motion in Plaintiff's left shoulder, although her strength was intact; her right arm and shoulder appeared normal.  Id. at 308.  At the time, Plaintiff did not report any numbness or tingling, or pain anywhere else.  Id.  Plaintiff declined the corticosteroid injection offered and requested physical therapy.  Id.  In June, Plaintiff again complained of restless legs and feet, and a burning sensation in her feet, but did not want to try medications such as Neurontin or Lyrica because she did not feel they would help.  Id. at 306.  She again requested a prescription for Norco, and Dr. Dimaraki obliged.  Id. at 307.  In April 2012, Dr. Dimaraki completed a diabetes mellitus residual functional capacity questionnaire, indicating that Plaintiff experienced symptoms such as fatigue,

general malaise, extremity pain and numbness, and dizziness and loss of balance; Dr. Dimaraki could not offer an opinion as to the functional limitations of those symptoms, or whether they interfered with Plaintiff's ability to concentrate.  Id. at 434-435.

In June 2011, Plaintiff also began care with Dr. Hammoud, reporting widespread musculoskeletal complaints, including pain in her lower back, neck, feet, and right hand and wrist; Plaintiff denied experiencing any pain, weakness, or numbness or tingling in her legs.  Id. at 298.  She also reported intolerance to ibuprofen, depressed mood, panic attacks, and difficulty concentrating.  Id.  On examination, Plaintiff had no significant edema in her extremities, no tenderness in her back, normal strength in her lower extremities, and a normal gait.  Id. at 298-299.  Plaintiff was prescribed a lower dosage of hydrocodone and naproxen.  Id. at 299.

On June 23, 2011, Plaintiff underwent x-rays of her spine and her right hand.  Id. at 362. The x-rays showed stable, but moderate, multilevel degenerative changes in Plaintiff's cervical spine "with hypertrophy of scattered bilateral uncovertebral joints and neural foramina encroachment."  Id.  There was also evidence of osteoarthritis in Plaintiff's right hand and "mild to moderate multilevel degenerative changes" in her lumbar spine.  Id.  Plaintiff was referred to physical therapy for what was described as arthritis in multiple areas, including her neck, lower back, and hands.  Id. at 292, 294-295, 375.  Plaintiff continued to request a higher dosage of narcotics, and she indicated that naproxen upset her stomach.  Id. at 286, 295.  She agreed to submit to a drug screening protocol, and one screen tested positive for cocaine and negative for the prescribed hydrocodone.  Id. at 285.  As a result of the positive screen, Dr. Hammoud refused to further provide Plaintiff with controlled substances.  Id. at 282, 284, 285.  Plaintiff also continued to report symptoms of peripheral neuropathy and restless legs.  Id. at 286.  Notes indicate Plaintiff exhibited some pain behavior when moving from seating to standing.  Id.

5

Plaintiff began physical therapy in July 2011, and her rehabilitation potential was considered good. Id. at 289-290. She had pain and difficulty while typing, writing, and carrying heavy objects; her average grip strength for each hand was approximately 50 pounds. Id. at 289. Plaintiff reported a pain level of "8" when she made frequent use of her right hand and thumb; there was mild swelling at the joint. Id. Plaintiff also began physical therapy for her left shoulder. Id. at 279. She had no pain at rest, but experienced pain at a "3" or "4" when she raised her arm above her shoulder. Id. The pain was "relieved to an extent with medication, and applying heat." Id. Plaintiff also reported pain and difficulty with pulling a shirt over her head, carrying items over five pounds, reaching overhead, turning a knob or opening a door, and sleeping on her left side. Id. Notably, Plaintiff reported being "pain free with all aspects of daily living prior to August 2010." Id. Upon exam, Plaintiff exhibited pain and restricted range of motion in her left shoulder. Id. at 279-280.

In other physical therapy notes, Plaintiff reported that she suffered from chronic neck and back pain for many years, and that occasionally the pain was unaffected by medication, ice, or heat. Id. at 273. She reported soreness in her back with sitting, standing, and when transferring positions, in addition to numbness and tingling in her left hand. Id. Her average pain was a "6," a "4" at best, and an "8" at worst. Id. Plaintiff had normal and functional range of motion in her thoracic, cervical, and lumber spines, with some tightness and pain. Id. at 275. Muscle testing in her upper and lower extremities appeared normal, with some pain in her left upper extremity. Id. at 276. Plaintiff had some pain in her upper and lower extremities during testing for tone, tightness, and flexibility. Id. She had a positive Spurling test on her left side and numbness in her bilateral hands upon standing. Id. at 276-277.[2] Plaintiff maintained normal balance while

---

[2] A "Spurling test" is a procedure to assess cervical nerve root compression; it "involves extending the patient's neck, moving the head to the affected side, and applying an axial load to

walking short distances and during transitional movements.  Id. at 277.  Reports indicate that Plaintiff did not return to the clinic after her initial evaluation for her hand and shoulder.  Id. at 422.

The record also contains handwritten medical notes dated May and July 2012 from Dr. Chernin, Plaintiff's primary care physician.  See id. at 87, 439-440.  These notes suggest that Plaintiff also complained of mild bilateral foot swelling, panic attacks, polyneuropathy, anxiety, situational depression, and pain in her shoulders and wrist.  Id. at 439-440.  She was not suffering from leg pain.  Id. at 439.  Plaintiff stated that other doctors refused to prescribe her Norco, so she was purchasing it "on the street," as well as smoking marijuana.  Id. at 440.  The records indicate that Plaintiff suffered from "a lot" of arthritis, and that a pain clinic suggested burning nerve endings in Plaintiff's back, but Plaintiff was already getting "good relief" from her pain using Hydrocodone.  Id. (emphasis in original).  The notes also indicate that Xanax was effective at controlling Plaintiff's panic attacks.  Id.[3]

As part of the initial disability determination process, Plaintiff underwent a mental status examination conducted by Thomas S. Rosenbaum, Ph.D., in October 2011.  Id. at 407-412.  Plaintiff's mood during the exam was mildly depressed, but Plaintiff maintained a "friendly and animated affective response" throughout.  Id. at 410.  Dr. Rosenbaum noted that Plaintiff's

---

the cervical spine to determine if symptoms of paresthesia or pain intensify."  Justice v. Comm'r of Soc. Sec., No. 1:12 CV 1541, 2013 WL 1759008, at *7 n.2 (citing TABER'S CYCLOPEDIC MEDICAL DICTIONARY (2011)), report adopted by 2013 WL 1759003 (N.D. Ohio Apr. 24, 2013).

[3] Plaintiff also submitted additional evidence to the Appeals Council in her request to review the ALJ's decision that post-dated the decision.  See A.R. at 10-47.  The Appeals Council denied Plaintiff's request, id. at 5, at which point the ALJ's decision became the final decision of the Commissioner, Wilson v. Comm'r of Soc. Sec., 378 F.3d 541, 543-544 (6th Cir. 2004).  This Court's review is limited to the evidence before the Commissioner at the time of the final decision; accordingly, these new records are not part of the Administrative Record for the purposes of judicial review.  Cotton v. Sullivan, 2 F.2d 692, 695-696 (6th Cir. 1993).

conversation was spontaneous and well-organized, that she had highly developed social skills, and that she was well-oriented. Id. at 409, 410, 411. Plaintiff reported a history of binge drinking and stated that her medical conditions caused her significant stress. Id. at 408, 409-410, 411. Dr. Rosenbaum further indicated that Plaintiff was experiencing "significant adjustment problems" with being in a position of dependency. Id. at 411. Based on that evaluation, Dr. Rosenbaum diagnosed Plaintiff with depressive disorder and pain disorder, and he assigned Plaintiff a global assessment of functioning score of 60. Id.

**B. Plaintiff's Testimony**

Plaintiff testified that she was unable to work because she had a hard time concentrating, and because she was in a lot of pain. A.R. at 86. Plaintiff indicated that arthritis caused her fingers to go stiff, that the balls of her feet hurt, that she had chronic hand and back pain, and that she could only raise her left arm to shoulder-level before it caused her pain. Id. at 86, 93, 94. She treats her pain with medication and physical therapy, but she stated that it was never below a "5," even with medication. Id. at 87, 95. Plaintiff testified that she could stand for ten minutes, walk for fifteen minutes, and sit for ten minutes; she indicated that she needs to frequently shift positions and she often lies down. Id. at 87-88. Her arm and hand prevent her from lifting objects over eight pounds, and she has difficulty pushing and pulling. Id. at 88-89. She can grocery shop, cook, do laundry, clean the house, wash dishes, and babysit her young granddaughter; she also spends time watching television and playing on the computer, but her back prevents her from spending more than ten minutes on the computer. Id. at 89-90, 91. She drives on a daily basis and can navigate stairs in her home. Id. at 90. Her restless legs prevent her from sleeping well at night. Id. at 91. Plaintiff testified that her memory is not very good anymore and that she has difficulty multitasking. Id. at 92.

Plaintiff admitted to using cocaine and marijuana to ease her pain and help her relax, stating that she could not find a doctor to prescribe her pain medication.  Id. at 95-96.  She also testified that she has more bad days than good days, and that on a bad day she mostly lies on the couch.  Id. at 97.  She testified that she did not take pain medication on the day of the hearing because she cannot drive on it.  Id. at 100.

### III.  LEGAL STANDARD

The Court reviews de novo those portions of the R&R to which a specific objection has been made.  See 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b).  Under 42 U.S.C. § 405(g), this Court's "review is limited to determining whether the Commissioner's decision 'is supported by substantial evidence and was made pursuant to proper legal standards.'"  Ealy v. Comm'r of Soc. Sec., 594 F.3d 504, 512 (6th Cir. 2010) (quoting Rogers v. Comm'r of Soc. Sec., 486 F.3d 234, 241 (6th Cir. 2007)).  "Substantial evidence is 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  Lindsley v. Comm'r of Soc. Sec., 560 F.3d 601, 604 (6th Cir. 2009) (quoting Richardson v. Perales, 402 U.S. 389, 401 (1971)).   In determining whether substantial evidence exists, the Court may "look to any evidence in the record, regardless of whether it has been cited by [the ALJ]."  Heston v. Comm'r of Soc. Sec., 245 F.3d 528, 535 (6th Cir. 2001).  "[T]he claimant bears the burden of producing sufficient evidence to show the existence of a disability."  Watters v. Comm'r of Soc. Sec. Admin., 530 F. App'x 419, 425 (6th Cir. 2013).

### IV.  ANALYSIS

Plaintiff purports to offer a single objection to the Magistrate Judge's R&R: that it was not harmless error for the ALJ to "play doctor."  Pl. Obj. at 1.  Yet, under that single objection,

Plaintiff makes a number of distinct complaints. The Court turns to each of these complaints in turn and ultimately finds them unpersuasive.

## A. Objection One

First, Plaintiff contends that the ALJ improperly opined on the source of Plaintiff's mental health issues and that, contrary to the Magistrate Judge's conclusion, this opinion constitutes reversible error. Pl. Obj. at 1-2. The Magistrate Judge concluded that the ALJ's opinion, which may have overstated the influence of alcohol as to the source of Plaintiff's mental health issues, did not undermine the overall conclusion, supported by mental health professionals, that Plaintiff's mental impairments were non-severe and did not cause any functional limitations. Id.; see also R&R at 16. Plaintiff disagrees with this assessment because (i) she "exhibited mildly depressed mood upon examination, and reported anxiety with associated panic attacks and depression beyond her sobriety," and (ii) because it is unclear from the Disability Determination Explanation ("Explanation") whether the reviewing consultant, Dr. Csokasy, considered Plaintiff's affective disorder to be severe or non-severe. Pl. Obj. at 2. Plaintiff goes on to state that, if her mental impairment was, in fact, severe, the ALJ failed to complete a mental residual functional capacity ("MRFC") as required under social security rules and regulations. Id. at 2-3.

The Court agrees with the Magistrate Judge that the ALJ's opinion regarding the source of Plaintiff's alleged mental impairments did not undermine the conclusion that Plaintiff's mental impairments were non-severe and did not warrant any particular limitations or restrictions. See White v. Comm'r of Soc. Sec., 572 F.3d 272, 284 (6th Cir. 2009) ("But the ALJ's inappropriate characterization of the causes of [the plaintiff's] condition is irrelevant because the clinical records themselves . . . support the ALJ's finding that [the plaintiff] retained

the ability to work . . . .").  As an initial matter, Plaintiff is correct that the Explanation at the initial level does contain a section that indicates Plaintiff's mental impairments were "severe." A.R. at 118.  Admittedly, the Court is unsure as to why this section so indicates, as this characterization is wholly at odds with the remainder of the Explanation.  Dr. Jerry Csokasy, Ph.D., the reviewing consultant, conducted a psychiatric review technique ("PRT") as required by 20 C.F.R. § 404.1520a to determine the severity of Plaintiff's mental impairments.  A.R. at 118-119.  Dr. Csokasy rated Plaintiff's degree of functional limitation in the first three functional areas as "mild," and he concluded that Plaintiff had no repeated episodes of decompensation.  Id. at 119.  Under the regulations, this degree of functional limitation "generally" renders a mental impairment non-severe.  20 C.F.R. § 404.1520a(d)(1).  Indeed, by way of further explanation, Dr. Csokasy wrote "limitations mild; mental impairment not severe."  A.R. at 119.  Furthermore, in the Explanation's analysis, any discussion of Plaintiff's mental impairments is accompanied by a notation indicating that Plaintiff's mental health impairments were non-severe.  Id. at 116, 118.  Accordingly, it is not unreasonable to conclude that Dr. Csokasy considered Plaintiff's mental impairments non-severe, which consideration was not out of step with the ALJ's own, independent application of the PRT in determining that Plaintiff's mental impairments were non-severe.  Id. at 70.

The ALJ's characterization was also supported by substantial evidence in the record. While Plaintiff occasionally reported symptoms of depression, anxiety, panic attacks, and difficulty concentrating, see id. at 244, 251, 354, 391-392, 440, there is no further information as to the frequency, severity, or disruptive nature of those symptoms.  Instead, Plaintiff reported getting "good relief" from Xanax, id. at 440, and she did not describe any functional limitations resulting from her alleged mental impairments on her adult function report, id. at 218-225.

11

Indeed, when asked during the administrative hearing by her attorney why Plaintiff wanted to see a psychiatrist, Plaintiff failed to identify with any sort of specificity the types of symptoms she was experiencing or the functional limitations those symptoms caused her.  See id. at 98 ("Because, I don't know if it was your office that told me that they wanted me to go see a psychiatrist before we came here."); id. ("If somebody tells me that's going to make me better, I'm all for it.  That's what I want, I want to get better."); id. at 99 ("I mean I'm on[ly] 53 years old, I'm too young to be like this.").  Furthermore, in a "Diabetes Mellitus Residual Functional Capacity Questionnaire," Plaintiff's treating physician, Dr. Dimaraki, did not indicate that any psychological symptoms affected Plaintiff's physical condition.  Id. at 434.  And while Dr. Rosenbaum noted that Plaintiff appeared "mildly depressed" during the exam, he also noted that she "maintained [a] friendly and animated affective response throughout [the] evaluation."  Id. at 410.  Although Plaintiff reported other symptoms such as "breaks with reality," or an "out-of-body experience," those symptoms occurred only while Plaintiff was drinking or processing a traumatic event.  See id. at 409.  And there is no indication that these symptoms have interfered with Plaintiff's ability to work or hold a job in the past.  Finally, Dr. Rosenbaum's diagnoses alone, id. at 411, do not convey whether Plaintiff's conditions interfere at all with Plaintiff's ability to work or otherwise function.  See Higgs v. Bowen, 880 F.2d 860, 863 (6th Cir. 1988) ("The mere diagnosis of arthritis, of course, says nothing about the severity of the condition."); see also Hill v. Comm'r of Soc. Sec., 560 F. App'x 547, 551 (6th Cir. 2014) ("[D]isability is determined by the functional limitations imposed by a condition, not the mere diagnosis of it.").  Accordingly, it was not unreasonable for the ALJ to conclude that Plaintiff's mental impairments were non-severe.[4]

---

[4] Because the Court concludes that substantial evidence supports the ALJ's determination that Plaintiff's mental impairments are non-severe, Plaintiff's argument that a MRFC must be

**B.  Objection Two**

Relatedly, Plaintiff argues that her non-severe mental impairments must be considered in combination with her severe impairments in determining her RFC, and that "the ALJ failed to incorporate <u>any</u> non-exertional limitations into his [sic] RFC finding despite objective clinical findings and subjective reports that Plaintiff suffers from mental health symptoms, as well as chronic pain, that would limit her ability to perform the mental demands of any job."  Pl. Obj. at 4 (emphasis in original); <u>see also</u> <u>id.</u> at 3 ("While it is not clear as to whether [Plaintiff's] deficits were a result of her mental impairments or chronic pain, the objective medical evidence supports non-exertional limitations which the ALJ failed to account for.").  Plaintiff contends that her alleged impaired concentration, persistence, and pace preclude her from performing her previous skilled work, and she specifically criticizes the ALJ's failure to limit her to "unskilled work or work that is not done in close proximity with the public."  <u>Id.</u> at 3-4.  Because the ALJ failed "to consider and evaluate any potential non-exertional symptoms," Plaintiff maintains that her case should be, at minimum, remanded.  <u>Id.</u> at 4.

As a threshold matter, Plaintiff appears to conflate or confuse two similar, but distinct, issues: first, whether the ALJ considered Plaintiff's non-severe mental impairments in combination with Plaintiff's severe physical impairments, and, second, whether substantial evidence supports the ALJ's decision not to include any non-exertional limitations in Plaintiff's RFC.  The Court addresses both issues below.

An ALJ is required to incorporate into a RFC only those limitations found to be credible.  <u>See</u> <u>Casey v. Sec'y of Health & Human Servs.</u>, 987 F.2d 1230, 1235 (6th Cir. 1993).  However, in assessing the RFC, social security regulations require the ALJ to consider both severe

_____

assessed is also rejected.  <u>See</u> 20 C.F.R. § 404.1520a(d)(3) ("<u>If</u> we find that you have a severe mental impairment(s) that neither meets nor is equivalent in severity to any listing, we will then assess your residual functional capacity." (emphasis added)).

impairments and non-severe impairments.  20 C.F.R. § 404.1545(e); see also Soc. Sec. R. 96-8p,

1996 WL 374184, at *5; White v. Comm'r of Soc. Sec., 312 F. App'x 779, 787 (6th Cir. 2009).

To the extent an ALJ determines that an identified impairment, severe or otherwise, does not

result in any work-related restrictions or limitations, the ALJ "is required to state the basis for

such conclusion."  Hicks v. Comm'r of Soc. Sec., No. 12-13581, 2013 WL 3778947, at *3 (E.D.

Mich. July 18, 2013); see also Schlicker v. Comm'r of Soc. Sec., No. 10-cv-13697, 2011 WL

5865148, at *11 (E.D. Mich. Nov. 4, 2011) report adopted by 2011 WL 5865082 (E.D. Mich.

Nov. 22, 2011); Murray v. Colvin, No. 3:12-0410, 2014 WL 5323061, at *12 (M.D. Tenn. Oct.

16, 2014) report adopted by 2014 WL 5824539 (M.D. Tenn. Nov. 7, 2014).  Indeed, "an 'ALJ

may not select and discuss only that evidence that favors his ultimate conclusion, but must

articulate, at some minimum level, his analysis of the evidence to allow the appellate court to

trace the path of his reasoning.'"  Lowery v. Comm'r of Soc. Sec. Admin., 55 F. App'x 333, 339

(6th Cir. 2003) (quoting Diaz v. Chater, 55 F.3d 300, 306 (7th Cir. 1995)).

Here, there is sufficient evidence in the ALJ's decision to indicate that the ALJ

considered Plaintiff's non-severe mental impairments in combination with Plaintiff's severe

impairments, and concluded that Plaintiff's non-severe mental impairments did not warrant any

workplace restrictions.  First, the ALJ expressly states in her decision that Plaintiff's "record

provides a history of anxiety and panic attacks, but nothing in recorded evidence to suggest that

they are interfering with work or activities of daily living."  A.R. at 69.  The Court recognizes

that this statement was made in the context of the ALJ's analysis under step two — in

determining whether Plaintiff's mental impairments were severe or non-severe.  However, it

explicitly demonstrates that the ALJ did not believe Plaintiff's non-severe mental impairments

warranted any corresponding, non-exertional limitations in the RFC.  This is supported by the

14

ALJ's statements in her RFC analysis that Xanax was effective at relieving Plaintiff's anxiety. Id. at 72, 74. These statements allow the Court to minimally infer that the ALJ considered Plaintiff's non-severe mental impairments and concluded that they imposed no workplace restriction or limitation.

Similarly, and contrary to Plaintiff's assertions, the RFC analysis makes clear that the ALJ did take into account potential non-exertional limitations. The ALJ indicated that Plaintiff complained of poor memory and difficulty multitasking. Id. at 72. However, the ALJ stated that Plaintiff admitted to performing simple tasks around the house, such as light cleaning, laundry, washing dishes, and cooking, and that Plaintiff babysits her young granddaughter. Id. at 71-72. Moreover, the ALJ observed Plaintiff during the administrative hearing and found Plaintiff to be sufficiently engaged in the examination process, noting that Plaintiff "did not appear to lose focus or concentration and her memory appeared unimpaired." Id. at 72.

And, despite Plaintiff's contention that objective medical evidence supports the existence of non-exertional limitations, the ALJ's disinclination to include any such limitations in the RFC is supported by substantial evidence. Plaintiff asserts that the "overall record supports that Plaintiff's impaired concentration, persistence, and pace affects her ability to perform her skilled past relevant work." Pl. Obj. at 3. However, the only evidence Plaintiff offers in support of this statement is her inability to do "serial 7s" without a pen and paper, and that "she could not think straight," after getting just one of three simple math problems wrong. Id. While these facts are reflected in Dr. Rosenbaum's report, it was not unreasonable for the ALJ to conclude that such evidence is not indicative of limitations with respect to concentration, persistence, or pace. Indeed, Dr. Rosenbaum also found Plaintiff to be well oriented, her conversation to be "spontaneous and fairly well organized," and as presenting no notable problems with her

memory or her abstract thinking.  See A.R. at 409-410.  While Plaintiff suggests that the ALJ should have limited Plaintiff to unskilled work or work that is not done in close proximity to the public, Plaintiff fails to point to any other evidence that she lacks the mental acuity to perform her previous skilled work, and her reference to a limitation regarding interaction with the public is particularly puzzling in light of Plaintiff's statements that she gets along well with others and is a "people person." Id. at 92, 408.

Plaintiff attributes, in part, her alleged non-exertional limitations to chronic pain. Accordingly, while Plaintiff does not directly raise the argument, the Court infers that Plaintiff is challenging the ALJ's assessment of the severity of Plaintiff's pain and consequent non-exertional functional limitations.  In her testimony before the ALJ, Plaintiff indicated that she had a hard time concentrating, in part at least, due to pain.  Id. at 86.  However, the ALJ expressly found that Plaintiff's testimony with regard to her pain intensity and its effects was not fully credible.  Id. at 72, 74; see also Jones v. Comm'r of Soc. Sec., 336 F.3d 469, 476 (6th Cir. 2003) ("[A]n ALJ is not required to accept a claimant's subjective complaints and may properly consider the credibility of a claimant when making a determination of disability.").  As summarized by the Sixth Circuit, the following legal standards govern an ALJ's credibility determination:

> It is of course for the ALJ, and not the reviewing court, to evaluate the credibility of witnesses, including that of the claimant. However, the ALJ is not free to make credibility determinations based solely upon an "intangible or intuitive notion about an individual's credibility."  Rather, such determinations must find support in the record.  Whenever a claimant's complaints regarding symptoms, or their intensity and persistence, are not supported by objective medical evidence, the ALJ must make a determination of the credibility of the claimant in connection with his or her complaints "based on a consideration of the entire case record." The entire case record includes any medical signs and lab findings, the claimant's own complaints of symptoms, any information

16

provided by the treating physicians and others, as well as any other relevant evidence contained in the record. Consistency of the various pieces of information contained in the record should be scrutinized. Consistency between a claimant's symptom complaints and the other evidence in the record tends to support the credibility of the claimant, while inconsistency, although not necessarily defeating, should have the opposite effect.

Social Security Ruling 96-7p also requires the ALJ explain his credibility determinations in his decision such that it "must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight." In other words, blanket assertions that the claimant is not believable will not pass muster, nor will explanations as to credibility which are not consistent with the entire record and the weight of the relevant evidence.

Rogers, 486 F.3d at 247-248 (citations and footnote omitted).

Here, the ALJ provided a sufficiently detailed explanation for why she discounted Plaintiff's statements regarding the severity of Plaintiff's pain and its effect on her concentration. The ALJ specifically noted that Plaintiff reported not taking any pain medication on the day of the hearing, but appeared to be in no apparent distress, was able to fully answer the questions asked, did not appear to lose focus or concentration, and showed no signs of an impaired memory. A.R. at 72. The ALJ also took into consideration Plaintiff's daily activities and her reports of pain to medical providers in determining that Plaintiff's reports of pain were not fully credible. Id. at 72-73, 74. An ALJ's credibility determination should not be disturbed absent a compelling reason. Smith v. Halter, 307 F.3d 377, 379 (6th Cir. 2001). And here, Plaintiff has not even directly challenged the ALJ's credibility determination, let alone offered a compelling reason for rejecting it. Indeed, aside from the few specific references to Dr. Rosenbaum's findings upon Plaintiff's mental status examination, Plaintiff merely makes vague, sweeping references to "the objective medical evidence," the "overall record," or "objective clinical

17

findings and subjective reports" in support of her argument that she suffers from non-exertional limitations. See Pl. Obj. at 3, 4. The Court does not make decisions about credibility, Garner v. Heckler, 745 F.2d 383, 387 (6th Cir. 1984), and Plaintiff has not demonstrated that the ALJ's credibility determination was somehow erroneous.

The ALJ's determination that Plaintiff's pain did not warrant any non-exertional limitations is further supported by substantial evidence. Plaintiff's recitation of her daily activities, such as doing light work around the house, driving, cooking, and shopping, suggests that Plaintiff is able to sufficiently concentrate and focus. A.R. at 89-90. Notably, on an adult function report, Plaintiff did not report that her conditions, including her chronic pain, affected her memory, her ability to complete tasks, her concentration or understanding, her ability to follow instructions, or her ability to get along with others. Id. at 223 (where adult function report requests the claimant to indicate which of the following listed items the alleged conditions affect). Plaintiff also indicated that she is able to pay attention for "as long as [something is] interesting," and that she finishes what she starts "most of the time." Id. She further stated that she can follow written instructions "pretty good," and that she follows spoken instructions by writing them down. Id. And, as discussed above, it was reasonable for the ALJ to infer from Plaintiff's mental status examination with Dr. Rosenbaum that Plaintiff did not have any non-exertional limitations, resulting from pain or otherwise. Accordingly, substantial evidence, much of it in the form of Plaintiff's own reports or statements, suggests that Plaintiff's pain does not impair her ability to concentrate or focus, nor does it affect her memory.

## C. Objections Three and Four

Plaintiff's last objections were not raised before the Magistrate Judge and, therefore, not addressed in the Magistrate Judge's R&R. In her motion for summary judgment, Plaintiff argued

that the ALJ failed to consider the limitations caused by Plaintiff's impairments and, therefore, adopted an erroneous and incomplete RFC.  Pl. Mot. for Sum. Judgment at 16-20 (Dkt. 23).  In her objections, however, Plaintiff raises a new and different argument with respect to the ALJ's RFC determination.  Specifically, Plaintiff argues that the ALJ interpreted raw medical data without the benefit of an expert opinion regarding Plaintiff's physical functional limitations, and, therefore, the ALJ improperly relied on her own lay opinion in determining the physical portion of Plaintiff's RFC.  Pl. Obj. at 5-7.  Plaintiff states that there is no physician medical opinion — treating or consulting — with regard to Plaintiff's physical functional limitations, and she maintains that the absence of such an opinion renders the ALJ's RFC determination without substantial support.  Id. at 5, 8.  Yet, somewhat contrarily, Plaintiff also asserts that the ALJ should have included functional limitations on the basis of symptoms identified by one of Plaintiff's physicians and "objective medical evidence of peripheral neuropathy," especially considering that the ALJ found Plaintiff's diabetes to constitute a severe impairment.  Id. at 7-8. Plaintiff argues that a remand is required so that a proper medical source opinion may be obtained.  Id. at 8.

A failure to raise certain arguments before a magistrate judge renders those arguments waived; courts generally will not consider new arguments presented for the first time on review. Murr v. United States, 200 F.3d 895, 902 n.1 (6th Cir. 2000); Murphy v. Lockhart, 826 F. Supp. 2d 1016, 1025-1026 (E.D. Mich. 2011) (collecting cases).  In any event, the position on which Plaintiff relies has received mixed reactions from district courts in the Sixth Circuit.  See Henderson v. Comm'r of Soc. Sec., No. 1:08 CV 2080, 2010 WL 750222, at *2 (N.D. Ohio Mar. 2, 2010) (rejecting the proposition that the absence of a medical assessment of functional ability renders an ALJ's RFC determination not supported by substantial evidence, because such a

proposition does not reflect social security law as set forth in the regulations or interpreted by the Sixth Circuit); see also Woelk v. Comm'r of Soc. Sec., No. 13-12411, 2014 WL 2931404, at *6-7 (E.D. Mich. May 15, 2014) (failure to cite to any medical opinion in formulating a RFC is not per se grounds for reversal), report adopted by 2014 WL 2931411 (E.D. Mich. June 30, 2014). This criticism finds strong support from the Sixth Circuit, which has held that an ALJ need not "base her RFC finding on a physician's opinion," because this would abdicate "'the Commissioner's statutory responsibility to determine whether an individual is disabled.'" Rudd v. Comm'r of Soc. Sec., 531 F. App'x 719, 728 (6th Cir. 2013) (quoting Soc. Sec. R. 96-5P, 1996 WL 374183, at *2). Nonetheless, given the procedural posture in which the argument was raised, the Court declines to address the merits of such an argument.

However, Plaintiff did raise her argument that the ALJ failed to consider the functional limitations caused by her diabetes mellitus in her motion for summary judgment, so the Court will address the merits of that objection. See Pl. Mot. for Sum. Judgment at 17-18. Plaintiff identifies symptoms of fatigue, extremity pain and numbness, dizziness and loss of balance, and "probable peripheral neuropathy." Pl. Obj. at 7. Plaintiff states that she showed clinical signs of peripheral neuropathy when she reported restless legs and feet, foot pain, and decreased sensation in her right foot. Id. at 8. The record does reflect Plaintiff's complaints, but, notably, Plaintiff had been off of her medications for about a month and a half at the time of some of the first complaints. A.R. at 250-251. Dr. Dimaraki offered to prescribe medication — Neurontin or Lyrica — but Plaintiff declined because she did not think that those medications would help. Id. at 245. In a visit to a different doctor less than a month later, Plaintiff denied any numbness, tingling, or radiation of pain beyond her buttocks, id. at 243, which suggests that she was not experiencing symptoms in her legs or feet. Further, there was no significant edema in her legs,

she had normal strength in her lower extremities, and she exhibited a normal gait.  Id. at 244.

Just a month after that, the same doctor prescribed a trial of gabapentin for Plaintiff's peripheral

neuropathy, but there are no objective findings accompanying that prescription, aside from an

observation that Plaintiff exhibited some pain behavior in moving from sitting to standing.  Id. at

241.  But, as mentioned above, a diagnosis of peripheral neuropathy does not, by itself, speak to

the severity of the condition.  See Higgs, 880 F.2d at 863; Hill, 560 F. App'x at 551.

Not only do Plaintiff's symptoms appear to be inconsistent, but she has provided no

evidence that they were interfering in her ability to work or function.  See Jones, 336 F.3d at 474

("[T]he claimant bears the burden of proving the existence and severity of limitations caused by

her impairments.").  The ALJ expressly stated that no evidence supported significant limitations

in Plaintiff's bilateral lower extremities.  A.R. at 73-74.  For instance, according to Plaintiff's

own testimony, she drives a car almost every day, which suggests that the alleged symptoms in

her legs and feet are not so severe as to prevent her from operating the foot pedals of a car.  Id. at

90.  Plaintiff is also able to clean, shop, and navigate stairs.  Id. at 89-90.  And Dr. Dimaraki

could not attest to any functional limitations associated with Plaintiff's neuropathy.  Id. at 434-

435 (stating unable to answer); id. at 73 (in ALJ's decision, noting that Dr. Dimaraki's

assessment was not helpful because it did not provide a function-by-function analysis).

Accordingly, the ALJ's decision not to include limitations associated with Plaintiff's peripheral

neuropathy is supported by substantial evidence.

Finally, Plaintiff, in a footnote, gestures to an additional argument not raised before the

Magistrate Judge that is predicated on the use of the "single decision-maker" ("SDM") model in

Plaintiff's claim.  The SDM model, according to Plaintiff, permits the disability examiner to

make an initial disability determination without the benefit of a medical opinion from a state

agency medical consultant.  Pl. Obj. at 5 n.1.  Plaintiff contends, however, that a medical opinion on the issue of equivalency under step three is required, and that, because no such medical opinion was offered at that stage in Plaintiff's case, "the great weight of authority" requires a remand.  Id. at 5 nn.1-2.

Again, the Court observes that this argument, insofar as it was not presented to the Magistrate Judge, is also waived.  Moreover, it is far from clear that Plaintiff is actually challenging the ALJ's step three determination.  Nowhere in her brief does Plaintiff contend that she suffers from an impairment or combination of impairments that meets or medically equals one of the listed impairments.  Lastly, it is also unclear that "the great weight of authority" requires remand on this issue, and, indeed, there is disagreement within this District on that very question.  See, e.g., Covey v. Comm'r of Soc. Sec., No. 12-10326, 2013 WL 462066, at *12 (E.D. Mich. Jan. 16, 2013) ("While the government has argued in other cases that courts in this district have concluded that the ALJ need not obtain expert opinion evidence in cases involving an SDM, the undersigned does not find these cases persuasive." (internal citation omitted)), report adopted by 2013 WL 461535 (E.D. Mich. Feb. 7, 2013).  Given the procedural posture of this argument, in addition to the cursory nature in which it was raised, the Court also declines to address this issue on the merits.

## V.  CONCLUSION

For the aforementioned reasons, the Court overrules Plaintiff's objections (Dkt. 28), accepts the recommendation contained in the Magistrate Judge's R&R (Dkt. 27), denies Plaintiff's motion for summary judgment (Dkt. 23), and grants Defendant's motion for summary judgment (Dkt. 25).

SO ORDERED.

Dated:  September 30, 2015          s/Mark A. Goldsmith
       Detroit, Michigan          MARK A. GOLDSMITH
                              United States District Judge

## **CERTIFICATE OF SERVICE**

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on September 30, 2015.

                                    s/Carrie Haddon
                                    Case Manager